IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELMER STEPHEN WEREB and BETTY WEREB,<br><br>Plaintiffs,<br><br>vs.<br><br>MAUI COUNTY, a political subdivision of the State of Hawaii; WILLIAM HANKINS, RANDALL BURGESS, DENNIS LEE, DONNA GOMES, GREGORY AMANO, EMITERIO ALVAREZ, KAMUELA MAWAE, AND JENNIFER KIA, employees and/or agents of MAUI COUNTY,<br><br>Defendants.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 09-00198 JMS/LEK<br><br>ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS HANKINS, BURGESS, LEE, GOMES, AMANO, ALVAREZ, MAWAE, AND KIA'S MOTION FOR SUMMARY JUDGMENT AND (2) DENYING DEFENDANT MAUI COUNTY'S MOTION FOR SUMMARY JUDGMENT |

## ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS HANKINS, BURGESS, LEE, GOMES, AMANO, ALVAREZ, MAWAE, AND KIA'S MOTION FOR SUMMARY JUDGMENT AND (2) DENYING DEFENDANT MAUI COUNTY'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiffs Elmer Stephen Wereb and Betty Wereb (collectively, "Plaintiffs") filed this civil rights action pursuant to 42 U.S.C. § 1983 following the in-custody death of their son, Dennis Wereb ("Wereb").  Beginning on September 26, 2008, Wereb was detained at the two-cell Lahaina Police Station in

Maui County.  On September 28, 2010 at 5:36 a.m. or sometime shortly thereafter, Wereb died of complications relating to alcoholism.[1]

Plaintiffs allege that during Wereb's confinement, Maui Police Department ("MPD") employees William Hankins ("Hankins"), Randall Burgess ("Burgess"), Dennis Lee ("Lee"), Donna Gomes ("Gomes"), Gregory Amano ("Amano"), Emiterio Alvarez ("Alvarez"), Kamuela Mawae ("Mawae"), and Jennifer Kia ("Kia") (collectively, "Individual Defendants") were deliberately indifferent to Wereb's medical needs and liable for Wereb's wrongful death. Plaintiffs also allege that Defendant Maui County was deliberately indifferent to Wereb's medical needs and liable for his wrongful death as a result of Maui County's failure to train its employees in sufficient monitoring techniques.  During Wereb's confinement, Individual Defendants did not follow MPD protocols requiring in-person visual checks of detainees and instead surveyed Wereb primarily through video monitoring.  Despite purportedly monitoring Wereb every fifteen minutes via video, MPD employees discovered Wereb's lifeless body on September 29, 2010 around 9:00 a.m. -- more than twenty-seven hours after Wereb's last recorded movement.

On May 4, 2009, Plaintiffs filed suit against Individual Defendants

---

[1]  The parties dispute the exact cause of Wereb's death.

and Defendant Maui County.  Individual Defendants and Maui County

(collectively, "Defendants") now bring Motions for Summary Judgment.

Defendants contend that no constitutional violations occurred and that qualified

immunity applies.  Maui County further contends that there is no evidence of an

unconstitutional custom or policy.  The court finds that a reasonable factfinder

could conclude that Mawae, Burgess, and Gomes are liable for deliberate

indifference to Wereb's serious medical needs.  The court further finds that a

reasonable factfinder could conclude that Maui County is liable for its failure to

train its employees to monitor detainees to determine if they require medical care.

For these reasons, and based on the following, the court GRANTS in part and

DENIES in part Individual Defendants' Motion for Summary Judgment and

DENIES Maui County's Motion for Summary Judgment.

## II.  BACKGROUND

### A.  Factual Background on Wereb

#### 1.  *Wereb's Arrest and Intake Processing*

On Friday September 26, 2008,[2] Mawae, an MPD police officer,

arrested Wereb for Terroristic Threatening in the First Degree after MPD received

---

[2]  For ease of reading, the court references the days at issue -- Friday September 26, 2008 through Monday September 29, 2008 -- by the days of the week rather than the dates.

a report that a man matching Wereb's description had shown a knife to juveniles while riding the bus.  Lutey Decl.[3] Ex. M, Mawae Decl. ¶¶ 2, 3.  Mawae observed that Wereb was untidy and disheveled.  Defs.' Suppl. Ex. GG, Mawae Dep. at 8:9-23.[4]  He also found a bottle of vodka in Wereb's bag and observed that he was intoxicated.  *Id.* at 18:21-22; Defs.' Ex. A at 1.  Mawae concluded, however, that Wereb could comprehend his questions and respond appropriately.  Defs.' Suppl. Ex. GG, Mawae Dep. at 18:11-18; Defs.' Ex. M, Mawae Decl. ¶ 4.

At the time of Wereb's arrest, Mawae also observed that Wereb had a "slow, choppy gait" and that he required assistance when standing up from a seated position.  Defs.' Ex. M, Mawae Decl. ¶¶ 6, 7.  Mawae believed that Wereb's feet were swollen due to infection, but could not see Wereb's feet and did not ask Wereb why they were swollen.  *Id.* ¶ 7; Defs.' Suppl. Ex. GG, Mawae Dep. at 37:9-21.  Wereb declined Mawae's offer to be seen by medics.  Defs.' Ex. M, Mawae Decl. ¶ 7.  At the time of his arrest, Wereb also had small abrasions on his forehead and the bridge of his nose.  Defs.' Ex. B at 2.

Mawae brought Wereb to the Lahaina Police Station where Kia, an

---

[3]  Individual Defendants and Maui County submit the same Declaration from their counsel Moana Lutey and attach the same set of exhibits to this Declaration.  For ease of reference, the court refers to these exhibits simply as Defendants' Exhibits.

[4]  When citing to exhibits with deposition transcripts, the court cites to the deposition pages and not the sequential exhibit pages.

MPD Public Safety Aid ("PSA"), handled Wereb's intake screening. Defs.' Ex. M, Mawae Decl. ¶¶ 9, 10. Mawae found that Wereb continued to be coherent and observed that Wereb "behaved in a flirtatious manner" with Kia. *Id*. ¶ 11. Kia filled out an additional intake screening form and fingerprinted Wereb. Defs.' Ex. J, Kia Decl. ¶¶ 3, 4; Defs.' Ex. A at 1. Kia did not perceive Wereb as being intoxicated and found that he understood her instructions and responded appropriately. Defs.' Ex. J, Kia Decl. ¶¶ 4, 5. Wereb informed Kia that he had diabetes, which Kia then marked on the intake form. *Id*. ¶ 6; Defs.' Ex. A at 2.

During Wereb's processing, MPD Sergeant Burgess entered the room to speak with Mawae about Wereb's arrest. Defs.' Ex. G, Burgess Decl. ¶ 3. Burgess observed Wereb and found that he appeared to be fine and not in need of medical attention. *Id*. ¶ 4. Although the intake screening form has a line for a supervisor's signature -- and MPD policy requires a supervisor to sign an inmate's intake form -- neither Burgess nor any other supervisor signed Wereb's intake form. *Id*. at 2; Heipt Decl.[5] Ex. M, Burgess Dep. at 43:1-9.

As part of his investigation, Mawae showed Wereb a Miranda waiver form. Defs.' Ex. M, Mawae Decl. ¶ 15; Defs.' Ex. N. This form contains two lines

---

[5] For ease of reference, the court hereafter refers to the exhibits attached to Erik Heipt's Declaration as simply as Plaintiffs' Exhibits.

intended for a detainee's signature -- on the first of these lines, Wereb entered what

could be his signature, but wrote the date as August 29, 2008 -- when it was in fact

September 26, 2008 -- and marked the time as "60:0F pm."  Defs.' Ex. N.  On the

next line intended for his signature, Wereb wrote "THEARTS FOAM PUNKKS."

*Id.*  Mawae asserts that he did not find Wereb's notations unusual and was not

alarmed by how Wereb filled out the form.  Defs.' Ex. M, Mawae Decl. ¶ 15;

Defs.' Suppl. Ex. GG, Mawae Dep. at 26:14-18.  Mawae "took [Wereb's writing]

to mean that [Wereb] wasn't being cooperative with the investigation, that he

didn't want to [cooperate], because that's obviously not his signature at that line."

Defs.' Suppl. Ex. GG, Mawae Dep. at 31:10-14.  Mawae stated that medics were

not called because he saw no indication that Wereb was in medical distress.  Defs.'

Ex. M, Mawae Decl. ¶ 13.

On Saturday at 10:00 a.m., MPD Officer Edwin Among ("Among"),

who is not a party to this suit, took Wereb out for a cigarette, interviewed him, and

again informed him of his Miranda rights.  Defs.' Ex. L, Among Decl. ¶¶ 7-9.

Wereb acknowledged that he understood his rights and properly signed the form.

*Id.* ¶ 8.  Wereb also filled out a Voluntary Statement Form, writing in full:

> I entered the bus went to the back seat I don't talk to
> anybody I keep to myself I was not having a problem
> with anybody The bus was pretty full.  I don't pay
> atten[tion] to anyone around me I exited the bus and was

placed under arrest I offered someone a tomato but don't
rec[a]ll who.  At no time did I threaten anyone on the
bus.

Defs.' Ex. O.  Despite Wereb's reference to offering someone a tomato, Among

found that Wereb "seemed coherent."  Defs.' Ex. L, Among Decl. ¶ 11.  Among

also observed that Wereb did not request medical attention, "did not appear to be in

any type of medical distress and had no trouble walking."  *Id*.  After Wereb

completed his statement at 10:15 a.m., Among escorted him back to his cell.

###   2.   *Wereb's Confinement and Monitoring*

On Friday at approximately 6:30 p.m., Wereb was placed in Cell 1 of

the Lahaina Police Station's two cells.  Defs.' Ex. J, Kia Decl. ¶ 7; Defs.' Ex. C at

1; Pls.' Ex. D, Amano Dep. at 19:21-22.  Except for his fifteen-minute interview

with Among on Saturday morning, Wereb remained in Cell 1 until he was

discovered dead on Monday at approximately 9:00 a.m.  Throughout Wereb's

confinement, PSAs monitored Wereb via video and wrote entries in a log every

fifteen minutes.  Defs.' Ex. C.  PSA are not police officers; they are civilian MPD

employees charged with intake and monitoring of detainees.  Pls.' Ex. D, Amano

Dep. at 7:19-24, 13:7-9.

On Friday evening, Kia monitored Wereb via video until her shift

ended at 10:30 p.m.  Defs.' Ex. J, Kia Decl. ¶ 7; Defs.' Ex. C at 1-2.  On Saturday,

Kia worked at the Lahaina Police Station from 2:30 p.m. until 10:30 p.m., but there is no evidence she monitored Wereb during that time.[6]  Joint Ex. 1; Defs.' Ex. C at 4-5.  During her shifts, Kia did not see any indication that Wereb required medical assistance.  Defs.' Ex. J, Kia Decl. ¶ 7; Defs.' Ex. C at 1-2.  Kia stated that if Wereb had exhibited signs of medical distress, she would have alerted her supervisors and medics would have been called.  Defs.' Ex. J, Kia Decl. ¶ 8.

When Kia's shift ended on Friday, PSA Gomes took over monitoring Wereb and the other detainees.  Gomes monitored the detainees from 10:30 p.m. on Friday until 6:30 a.m. on Saturday.  Defs.' Ex. C at 2-3; Joint Ex. 1.  After that, she returned for two more shifts to monitor the detainees -- on Sunday from 6:30 a.m. until 2:30 p.m. and on Monday from 6:30 a.m. until 10:30 a.m.  Defs.' Ex. C at 6-7, 10-11; Joint Ex. 1.  Gomes had no direct contact with Wereb during any of her shifts and monitored him exclusively by video.  Pls.' Ex. F, Gomes Dep. at 36:12-16, 29:3-32:7.  Gomes stated that if Wereb had exhibited signs of medical distress, she would have alerted her supervisors and medics would have been called.  Defs.' Ex. I, Gomes Decl. ¶ 5.

When monitoring Wereb and the other detainees by video, Gomes was

---

[6] Alvarez monitored the detainees, including Wereb, during this time.  Defs.' Ex. C at 4-5.

looking to see "[i]f they were okay" and if "[t]hey move around."  Pls.' Ex. F,

Gomes Dep. at 50:22-51:2.  Gomes also explained that she monitored Wereb to see

"[t]hat he was there [in his cell]."  *Id*. at 56:24-57:2.  Gomes did not see Wereb

move around while she monitored him, *id*. at 51:3-10, 57:4-7, and she "d[i]dn't

know" why she did not follow up on Wereb's failure to move during the time that

she monitored him.  *Id*. at 57:6-9.  In the log book, Gomes wrote "Pris sleeping" or

quotation marks indicating the same every fifteen minutes for the duration of her

first shift.  Defs.' Ex. C at 2-3.  During her Sunday shift, Gomes wrote a few notes

about a detainee other than Wereb, but most often wrote "Pris ok" in the log.  *Id*. at

7.

     Alvarez, a PSA recruit, and PSA Amano also monitored Wereb via

video during his confinement.  Alvarez monitored Wereb from 2:30 p.m. until

10:30 p.m. on both Saturday and Sunday.  Defs.' Ex. C at 4-5, 8-9; Joint Ex. 1.

Amano monitored Wereb from 10:30 p.m. on Saturday until 6:30 a.m. on Sunday

and again from 10:30 p.m. on Sunday until 6:30 a.m. on Monday.  Defs.' Ex. C at

5-6, 9-10; Joint Ex. 1.  Neither Alvarez nor Amano had any direct contact with

Wereb -- both monitored him exclusively through video.  Pls.' Ex. C, Alvarez Dep.

at 22:6-12, 17:9-20:5; Pls.' Ex. D, Amano Dep. at 61:2-21.  Both Alvarez and

Amano stated that Wereb did not appear to be in distress and that they would have

alerted their supervisors or called medics if they had observed Wereb in distress.

Defs.' Ex. K, Alvarez Decl. ¶ 5; Defs.' Ex. H, Amano Decl. ¶ 4.

Alvarez found that Wereb "didn't appear to be needing anything" during Alvarez' time monitoring him.  Pls.' Ex. C, Alvarez Dep. at 24:6-12. Alvarez wrote "Pris ok" for most of his entries in the log book and made no entries specific to Wereb.  Defs.' Ex. C at 4-5, 8-9.  Alvarez was aware that Wereb failed to eat during his Sunday afternoon shift, but stated that he did not know that Wereb failed to drink, go to the bathroom, sit up, or otherwise move during that shift. Pls.' Ex. C, Alvarez Dep. at 57:5-23; Defs.' Ex. C at 8 (indicating that "Wereb refused meal").  Although he did not check on Wereb in person, Alvarez indicated that he understood the importance of in-person monitoring.  Alvarez stated that he knew the purpose of in-person checks was to determine whether detainees needed medical care and that conducting such checks could mean the difference between life and death.  Pls.' Ex. C, Alvarez Dep. at 21:13-22:5.

Amano wrote exclusively "Pris ok" and arrows indicating the same in the log book for his Saturday evening to Sunday morning shift.  Defs.' Ex. C at 5-6.  During this shift, at 5:36 a.m. on Sunday, Wereb made his final movement. Defs.' Concise Statement of Facts ¶ 20; Pls.' Ex. D, Amano Dep. at 67:16-67:23. On Sunday evening through Monday morning, Amano against wrote "Pris ok" in

most lines of the log book, as well as a few entries related to detainees other than Wereb.  Defs.' Ex. C at 9-10.  Amano later stated that he knew Wereb did not eat during his shift, but that this did not worry Amano.  Pls.' Ex. D, Amano Dep. at 67:9-11.  Amano also stated that he knew the purpose of monitoring detainees was to determine whether they needed medical care and that such monitoring should be conducted carefully and thoroughly.  *Id*. at 13:13-25.

### 3.    *Supervision of the PSAs*

MPD Sergeants Hankins, Burgess, and Lee were the supervisors on duty during Wereb's confinement.  Joint Ex. 1.  As supervisors, Hankins, Burgess, and Lee were responsible for directing and leading the PSAs and ensuring that the PSAs followed MPD guidelines.  Pls.' Ex. B, Lee Dep. at 29:21-23; Pls.' Ex. H, Hankins Dep. at 9:16-19; Pls.' Ex. E, Burgess Dep. at 54:2-10.  Burgess and Lee stated, however, that they were not specifically charged with training the PSAs and Hankins, Burgess, and Lee did not, in practice, train the PSAs.  Pls.' Ex. E, Burgess Dep. at 29:16-23, 54:4-7, 56:8-20; Pls.' Ex. B, Lee Dep. at 29:8-23; Pls.' Ex. H, Hankins Dep. at 16:19-22; 56:4-19.  Hankins, Burgess, and Lee also never ensured that the PSAs conducted in-person checks of the prisoners.  Pls.' Ex. H, Hankins Dep. at 32:9-21; Pls.' Ex. E, Burgess Dep. at 99:11-17, 100:7-9, 104:20-24; Pls.' Ex. B, Lee Dep. at 46:2-5.

11

During Wereb's confinement, Hankins, Burgess, and Lee did not conduct any in-person checks on Wereb.  Pls.' Ex. H, Hankins Dep. at 32:17-18; Pls.' Ex. E, Burgess Dep. at 88:20-22; Pls.' Ex. B, Lee Dep. at 44:14-17. As a result, except when Burgess saw Wereb during Wereb's intake processing, neither Hankins, Burgess, nor Lee ever saw Wereb in person.  Indeed, during Wereb's confinement, Hankins only worked on Sunday evening through Monday morning -- likely after Wereb had died.  Joint Ex. 1.

Burgess was on duty on Sunday from 5:30 a.m. until 6:45 p.m., during which time Wereb made his last movement.  Defs.' Concise Statement of Facts ¶ 20.  Burgess stated that had Wereb appeared to need medical attention, medics would have been called immediately.  Defs.' Ex. G, Burgess Decl. ¶ 4.  Burgess also stated, however, that he realized during his shift that Wereb may have been unconscious or in a coma.  Pls.' Ex. E, Burgess Dep. at 93:12-20.  Despite realizing that Wereb may have been unconscious or in a coma, Burgess did not go observe Wereb in person, check to see if he was breathing, or take any other actions to follow up on Wereb's condition.  *Id*. at 88:20-22, 93:21-94:15.

Following Wereb's death, MPD's Administrative Review Board reprimanded Hankins, Burgess, and Lee for their conduct during Wereb's

confinement.  Budge Decl. Ex. A at 2-4.[7]  MPD's Administrative Review Board

concluded that Hankins, Burgess, and Lee violated three provisions of the MPD

General Orders, including General Order 103.1 § IV(B)(1).  *Id*.  This General

Order provides that superior officers shall "lead, direct, train, guide, and supervise

officers in their assigned duties."  Defs.' Suppl. Ex. HH at § IV(B)(1).  General

Order 103.1 defines "officers" as "all employees who have taken an oath of office

and have been given the authority to serve as commissioned police officers within

the County of Maui."  *Id*. at § III.

### 4.    *Wereb's Death*

Wereb's last movement was at 5:36 a.m. on Sunday and he was

discovered at approximately 9:00 a.m. on Monday.  Defs.' Concise Statement of

Facts ¶ 20; Defs.' Ex. C at 10-11.  The exact time of death is unknown and the

cause of death is disputed.

Maui County coroner Anthony Manoukian ("Manoukian") conducted

Wereb's autopsy.  Defs.' Ex. D, Manoukian Decl. ¶¶ 1, 5.  Manoukian found that

Wereb died of severe fatty metamorphosis of the liver.  *Id*. ¶ 9; Defs.' Ex. B at 1.

Alcoholism causes severe fatty metamorphosis of the liver, a condition that

develops over time and that would not have developed while Wereb was in

---

[7]  Exhibit A is unnumbered, but the court counts its pages sequentially.

custody.  Defs.' Ex. D, Manoukian Decl. ¶¶ 9, 10.  According to Manoukian,

"Wereb could have died from fatty metamorphosis of the liver at any time,

suddenly and unexpectedly" and the symptoms prior to death would not have been

visible to police personnel or other persons.  *Id*. ¶¶ 11, 12.

Plaintiffs' experts dispute Manoukian's conclusion and posit that

Wereb died of complications related to alcohol withdrawal.  Jarris Decl. Ex. 1 at 6;

Spitz Decl. ¶ 2.  Further, Plaintiffs' experts contend that based on the videos taken

during his confinement, Wereb was exhibiting noticeable signs and symptoms of

alcohol withdrawal on Saturday night and Sunday morning.  Jarris Decl. Ex. 1 at 5;

Spitz Decl. Ex. 1 at 3.  Accordingly, Plaintiffs' experts contend that Wereb's death

was preventable and could have been avoided by more vigilant monitoring.  Jarris

Decl. Ex. 1 at 6; Spitz Decl. Ex. 1 at 5-6; Rosazza Decl. Ex. 1 at 6.

## B.    Factual Background on MPD's Intake Policy

### 1.    *General Order 408.3*

MPD General Order 408.3 ("MPD's Intake Policy") provides that the

intake screening process shall inquire into: a prisoner's health, medication,

behavior (including state of consciousness and mental status), body deformities,

and arrest information.  Pls.' Ex. P § III(A)(1).  MPD's Intake Policy states that

"Intake Screening is utilized as a form for triage to detect" behavior including

"[a]lcohol and drug intoxication" and directs that "[a]ll staff, including arresting, transporting, receiving desk officers and shift supervisors shall remain alert to . . . intoxication/withdrawal." *Id.* §§ III(B)(e), C(2)(B). "When the intake screening process reveals that a prisoner requires special attention, the supervisor shall attempt to release custody to a more appropriate agency . . . ." *Id.* § III(A)(3). MPD's Intake Policy otherwise largely concerns MPD's efforts to prevent suicides.

### 2.    *Training on Intake of Detainees At-Risk for Alcohol Withdrawal*

MPD's Chief of Police, as well as many MPD employees, are aware that a large population of alcoholics live in Maui and frequent the Lahaina Police Station. Pls.' Ex. A, Phillips Dep. at 18:12-25; Pls.' Ex. B, Lee Dep. at 30:23-31:9; Pls.' Ex. D, Amano Dep. at 27:14-19; Pls.' Ex. E, Burgess Dep. at 51:21-24, 52:11-15; Pls.' Ex. F, Gomes Dep. at 13:3-9, Pls.' Ex. C, Alvarez Dep. at 63:20-22. MPD employees were not trained, however, to determine whether detainees entering the Lahaina Police Station were at risk for alcohol withdrawal. Pls.' Ex. F, Gomes Dep. at 18:19-19:22; Pls.' Ex. D, Amano Dep. at 24:18-21; Pls.' Ex. B, Lee Dep. at 31:17-20; Pls.' Ex. E, Burgess Dep. at 47:10-21. Although MPD supervisors apparently received some training on the symptoms of alcohol withdrawal, employees were not trained to assess whether detainees were experiencing alcohol withdrawal. Pls.' Ex. E, Burgess Dep. at 45:5-21, 47:10-21.

15

C.      **Factual Background on MPD's Monitoring Policy**

1.      *General Order 408.6*

MPD General Order 408.6 ("MPD's Monitoring Policy")

"establish[es] guidelines and procedures for the processing, supervision and release

of prisoners in a holding facility or temporary detention area."  Pls.' Ex. J § I.

MPD's Monitoring Policy requires detention facilities to maintain a "detailed,

handwritten log . . . whenever a prisoner is confined."  *Id*. § V(E)(I).  In these logs,

"[d]etailed entries concerning handling, conduct and visitors of prisoners shall be

logged (e.g., report number; date, time placed in cell; time fed; time removed from

cell; name of visitors . . . etc.)."  *Id*. § V(E)(II); *see also* Defs.' Ex. C.

On the issue of supervision of detainees, MPD's Monitoring Policy

requires that the supervisor on duty "shall determine the level of prisoner

supervision necessary" and that "PSAs or designated officers are responsible for

maintaining a 24 hour watch of prisoners in custody."  *Id*. § VI(A)(1)-(2).  MPD

employees must conduct at least three different types of checks of the prisoners.

First, a supervisor or designated employee must "conduct and document a prisoner

count and status check" at the beginning of his or her shift and at the end of his or

her shift.  *Id*. § VI(A)(3).  Second, "[a] <u>face to face</u> prisoner count shall be

documented . . . at least once every eight hours."  *Id*. (emphasis in original).  Third,

16

under a heading titled "Mandatory Periodic Physical Checks," employees shall "conduct and document visual checks of prisoners at least every fifteen minutes." *Id*. § VI(A)(3)(a).  In a section on video monitoring, MPD's Monitoring Policy provides that "the physical checks of prisoners may be conducted as a supplement to and not in lieu of regular monitoring of the video surveillance screen and/or audio intercom."  *Id*.

### 2. *Training on Detainee Monitoring*

Although they received a copy of MPD's Monitoring Policy, the PSAs in charge of monitoring detainees at the Lahaina Police Station did not receive training on the Policy.  Pls.' Ex. F, Gomes Dep. at 23:17-20; Pls.' Ex. D, Amano Dep. at 37:2-8; Pls.' Ex. G, Tabios Dep. at 42:6-11; *cf*. Pls.' Ex. A, Phillips Dep. at 75:24-76:1.  Sergeants likewise were not trained on MPD's Monitoring Policy.  Pls.' Ex. E, Burgess Dep. at 61:19-22, 108:13-16; Pls.' Ex. B, Lee Dep. at 65:17-24; Pls.' Ex. H, Hankins Dep. at 58:7-10.  PSAs and their supervisors also did not receive training on what to look for when monitoring detainees via video.  Pls.' Ex. B, Lee Dep. at 29:4-7; Pls.' Ex. E, Burgess Dep. at 29:13-15; Pls.' Ex. D, Amano Dep. at 14:12-14.

In fact, MPD employees expressed confusion about the meaning of MPD's Monitoring Policy.  Pls.' Ex. D, Amano Dep. at 36:2-9; Pls.' Ex. E,

Burgess Dep. at 61:11-15.  Lee stated that "different people could easily interpret [MPD's Monitoring Policy] different ways."  Pls.' Ex. B, Lee Dep. at 56:1-2.  Indeed, MPD's Chief of Police stated that MPD's Monitoring Policy requires an MPD employee to visually check on detainees in person, and not just through video monitoring, every fifteen minutes.  Pls.' Ex. A, Phillips Dep. at 74:12-76:4.  Burgess and Amano understood that in-person visual checks had to be conducted every eight hours and that more frequent checks could be conducted exclusively through video monitoring.  Pls.' Ex. E, Burgess Dep. at 60:3-12; Pls.' Ex. D, Amano Dep. at 33:4-25.  Lee understood MPD's Monitoring Policy to require exclusively video monitoring with no mandated in-person visual checks.  Pls.' Ex. B, Lee Dep. at 44:18-46:21.[8]

---

[8] In deposition, Lee testified:

| | |
|---|---|
| Q. | [Plaintiff's counsel questioning].  Why didn't you conduct any of these in-person checks that we've just discussed? |
| A. | [Lee].  Because we do a constant visual on the monitor every 15 minutes. |
| Q. | Okay.  So, did you believe based on your training that that's all you had to do? |
| A. | Yes. |
| Q. | And would that also be why you didn't ensure that your PSA[s] did any of these in-person physical type checks that we've just been talking about? |
| A. | Yes. |
| Q. | And was it your understanding back then at least that no matter how long a person was staying at the police station holding facilities, you could do all of your checks by way of looking at the monitor? |

(continued...)

### 3.      *Monitoring Practices in the Lahaina Police Station*

At the time of Wereb's detention, MPD employees in the Lahaina Police Station did not follow the MPD Monitoring Policy.  Pls.' Ex. B, Lee Dep. at 58:10-13.  As a matter of practice, MPD employees monitored all detainees exclusively through video monitoring and did not conduct in-person visual checks.  Pls.' Ex. F, Gomes Dep. at 28:15-20, 36:17-20.  Accordingly, Individual Defendants did not conduct any in-person visual checks on Wereb during his detention.  Pls.' Ex. F, Gomes Dep. at 36:12-16, 29:3-32:7; Pls.' Ex. C, Alvarez Dep. at 22:6-12, 17:9-20:5; Pls.' Ex. D, Amano Dep. at 61:2-21; Pls.' Ex. H, Hankins Dep. at 32:17-18; Pls.' Ex. E, Burgess Dep. at 88:20-22; Pls.' Ex. B, Lee Dep. at 44:14-17.

Individual Defendants relied on video monitoring despite their awareness of multiple disadvantages of video monitoring -- including the small-sized image, lack of audio, and inability to see details like sweating, shaking, or changes in skin color.  *See*, *e.g.*, Pls.' Ex. C, Alvarez Dep. at 21:13-22:5, 29:19-23; Pls.' Ex. B, Lee Dep. at 25:20-24, 26:7-10; Pls.' Ex. F, Gomes Dep. at 38:23-39:4; Pls.' Ex. E, Burgess Dep. at 25:22-25, 33:9-13; Pls.' Ex. D, Amano Dep. at 19:17-

---

[8](...continued)
>            A.      Yes.

Pls.' Ex. B, Lee Dep. at 46:6-21.

20, 22:6-14, 67:16-23.  Gomes and Lee stated that they would have conducted

more thorough in-person visual checks on detainees had they been trained to do so.

Pls.' Ex. F, Gomes Dep. at 37:2-14; Pls.' Ex. B, Lee Dep. at 65:22-66:5.

## D.   Procedural Background

On May 4, 2009, Plaintiffs filed the Complaint.  Against all

Defendants, Plaintiffs allege 42 U.S.C. § 1983 claims under the Eighth and

Fourteenth Amendments and state law claims for wrongful death.[9]

On May 14, 2010, Maui County and Individual Defendants filed their

Motions for Summary Judgment seeking judgment on all claims.  On June 21,

2010, Plaintiffs filed Oppositions.  On June 28, 2010, Maui County and Individual

Defendants filed Replies.  A hearing was held on July 12, 2010.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

---

[9]  In the First Amended Complaint, Plaintiffs allege that Defendants are liable under § 1983 for violating Wereb's Eighth and/or Fourteenth Amendment rights.  The court construes the First Amended Complaint to allege violations of Wereb's Fourteenth Amendment but not Eighth Amendment rights, however, because the Due Process Clause, rather than the Eighth Amendment, applies to pretrial detainees like Wereb.  *See Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979).

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of*

*Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

       "A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's*

*Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has

carried its burden under Rule 56(c) its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts [and] come forward

with specific facts showing that there is a *genuine issue for trial*." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal

quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (stating that a party cannot "rest upon the mere allegations or

denials of his pleading" in opposing summary judgment).

       "An issue is 'genuine' only if there is a sufficient evidentiary basis on

which a reasonable factfinder could find for the nonmoving party, and a dispute is

'material' only if it could affect the outcome of the suit under the governing law."

*In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV.  DISCUSSION

Defendants contend that summary judgment is appropriate because no constitutional violations occurred and qualified immunity applies.  Maui County further contends that there is no evidence of an unconstitutional custom or policy.

The court examines Plaintiffs' § 1983 claims in three parts: (1) Plaintiffs' personal liability claims against Individual Defendants; (2) Plaintiffs' supervisory liability claims against Burgess, Hankins, and Lee; and (3) Plaintiffs' *Monell* liability claim against Maui County.  The court then turns to Plaintiffs' state law claims.

## A.    Plaintiffs' § 1983 Claims Against Individual Defendants

Plaintiffs allege § 1983 claims against Individual Defendants based on the Fourteenth Amendment as a result of these Defendants' alleged deliberate

indifference to Wereb's medical needs.  The court sets out the deliberate indifference framework and then applies that framework to each Defendant.

### 1.    *Deliberate Indifference of Medical Needs Framework*

Through the Fourteenth Amendment's due process clause, pre-trial detainees are entitled to be free of cruel and unusual punishment.  *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979); *Simmons v. Navajo County, Ariz.*, --- F.3d ---, 2010 WL 2509181, at *4 (9th Cir. June 23, 2010).  Failure to provide medical treatment amounts to cruel and unusual punishment when (1) a detainee has a "serious medical need" and (2) detention officials are "deliberately indifferent" to that need. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).  A serious medical need exists when, viewed objectively, "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."  *Jett*, 439 F.3d at 1096 (citation and quotation omitted).

Deliberate indifference requires that a detention official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  The test is a subjective one because "prison officials who lacked

knowledge of a risk cannot be said to have inflicted punishment." *Id*. at 844. Accordingly, a plaintiff must show that an official was "(a) *subjectively aware* of the serious medical need and (b) failed adequately to respond." *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010) (citing *Farmer*, 511 U.S. at 828). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

A detention official's knowledge of substantial risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that the prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. at 842 (citations omitted); *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (finding that summary judgment on a detainee's medical indifference claim was improperly granted because "the officers' indifference to Lolli's extreme behavior, his obviously sickly appearance and his explicit statements that he needed food because he was a diabetic could easily lead a jury to find that the officers consciously disregarded a serious risk to Lolli's health"); *Conn*, 591 F.3d at 1097 ("Proof of 'subjective awareness' is not limited to the purported recollections of the individuals involved."). "*Farmer*'s obviousness requirement

24

does not necessitate a showing that an individual prison official had specific knowledge that harsh treatment of a particular inmate, in particular circumstances, would have a certain outcome." *Thomas v. Ponder*, --- F.3d ---, 2010 WL 2794394, at *6 (9th Cir. July 16, 2010). Instead, obviousness is measured "in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved." *Id*. (citing *Farmer*, 511 U.S. at 842). The obviousness of a risk is not conclusive, however, and a defendant "may show that the obvious escaped him." *Farmer*, 511 U.S. at 843 n.8.

### 2.    *Plaintiffs' Opposition to the Deliberate Indifference Framework*

Although Plaintiffs contend that a genuine issue of material fact exists under the deliberate indifference framework -- an issue that the court addresses at length below -- Plaintiffs also dispute whether the subjective knowledge requirement of deliberate indifference is applicable here. Plaintiffs contend that Individual Defendants' lack of subjective knowledge about Wereb's serious medical need does not absolve them of liability because, according to Plaintiffs, Individual Defendants deliberately avoided acquiring subjective knowledge by failing to monitor Wereb. Pls.' Opp'n to Individual Defs.' Mot. for Summ. J. at 23.

Plaintiffs present compelling evidence that Individual Defendants failed to closely monitor Wereb.  Most shockingly, not one Individual Defendant discovered Wereb for more than twenty-seven hours after his last-recorded movement, despite the facts that Wereb was continuously being recorded and that his skin had started to turn drastic shades of purple.  Defs.' Concise Statement of Facts ¶ 20; Defs.' Ex. C at 10-11; Pls.' Ex. N.  Throughout Wereb's confinement, Individual Defendants failed to conduct in-person visual checks.  Pls.' Ex. F, Gomes Dep. at 36:12-16, 29:3-32:7; Pls.' Ex. C, Alvarez Dep. at 22:6-12, 17:9-20:5; Pls.' Ex. D, Amano Dep. at 61:2-21; Pls.' Ex. H, Hankins Dep. at 32:17-18; Pls.' Ex. E, Burgess Dep. at 88:20-22; Pls.' Ex. B, Lee Dep. at 44:14-17.

Disturbing as this evidence may be, however, Plaintiffs cannot evade the subjective knowledge component of the deliberate indifference standard. *Farmer* held that deliberate indifference requires subjective knowledge because the Constitution forbids cruel and unusual "punishments," not merely cruel and unusual conditions.  *Farmer*, 511 U.S. at 837.  Thus, a cruel and unusual punishment inquiry must examine a prison official's state of mind, *id*. at 838 (citing *Wilson v. Seiter*, 509 U.S. 294, 299-302 (1991)), and "[p]rison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." *Id*. at 844.  As a result, unless Individual Defendants were subjectively aware that Wereb

26

faced a substantial risk of serious harm, Individual Defendants' inaction in monitoring Wereb was not a form of "punishment" forbidden by the Constitution. Accordingly, the court rejects Plaintiffs' contention that Individual Defendants need not have possessed subjective knowledge that Wereb had a serious medical need or faced a substantial risk.

In a similar vein, Plaintiffs also attempt to side step the subjective knowledge requirement by arguing that Individual Defendants are liable because they were subjectively aware of the drawbacks of monitoring detainees over video. Individual Defendants were aware of multiple disadvantages of video monitoring -- including the small-sized image, lack of audio, and inability to see details like sweating, shaking, or changes in skin color.  *See*, *e.g.*, Pls.' Ex. C, Alvarez Dep. at 21:13-22:5, 29:19-23; Pls.' Ex. B, Lee Dep. at 25:20-24, 26:7-10; Pls.' Ex. F, Gomes Dep. at 38:23-39:4; Pls.' Ex. E, Burgess Dep. at 25:22-25, 33:9-13; Pls.' Ex. D, Amano Dep. at 19:17-20, 22:6-14, 67:16-23.  Plaintiffs' argument fails, however, because Individual Defendants' subjective knowledge that Wereb could have been monitored more closely or more thoroughly is not commensurate with subjective knowledge that Wereb faced a substantial risk due to a lack of close or thorough monitoring.  The court therefore finds that Plaintiffs cannot defeat summary judgment on the basis of Individual Defendants' subjective awareness of

27

the flaws in the monitoring system alone.

### 3. *Deliberate Indifference Application*

#### a. *Serious medical need*

Wereb had at least one and possibly several serious medical needs.

Diabetes is a serious medical need. *Lolli*, 351 F.3d at 419-420 ("[A] constitutional

violation may take place when the government does not respond to the legitimate

needs of a detainee whom it has reason to believe is diabetic."). A fact question

exists whether the combination of Wereb's other ailments -- intoxication, swollen

and infected feet, head abrasions, and incoherence (as indicated by his responses

on the Miranda waiver form) -- also constituted a serious medical need. Likewise,

at the very least a factual question exists whether either unconsciousness or a coma

-- states which Wereb may have entered -- constitute a serious medical need

because failure to provide treatment "could result in further significant injury."

*See generally Jett*, 439 F.3d at 1096.

#### b. *Subjective knowledge and failure to respond*

In this case, the officers charged with monitoring Wereb were

collectively negligent -- and probably grossly negligent -- in carrying out that duty.

Deliberate indifference is distinct from negligence, however, and the court must

focus on each Individual Defendant's subjective knowledge. *See Wood v.*

*Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (finding that gross negligence does not amount to a constitutional violation).  The court must determine through "the usual ways, including inference from circumstantial evidence," whether a factual question exists that Individual Defendants knew of Wereb's serious medical needs and failed to adequately respond.  *Farmer*, 511 U.S. at 842.  Accordingly, the court examines the subjective awareness of each Individual Defendant.[10]

In determining Individual Defendants' subjective awareness, the court considers evidence of (1) each Defendant's knowledge of Wereb's medical condition; (2) each Defendant's actions in monitoring, interacting with, or observing Wereb; (3) each Defendant's statements indicating subjective knowledge about Wereb's condition; and (4) all other available evidence.  After examining the facts in the record, the court finds no evidence from which an inference could be drawn that Kia, Amano, Alvarez, Hankins, or Lee had subjective knowledge of Wereb's serious medical need.  A reasonable factfinder could conclude, however, that Mawae, Burgess, and Gomes were aware of the serious risks of substantial

---

[10]  Notably, Plaintiffs refer to Defendants collectively and do not individually address each Individual Defendant's subjective knowledge.  Because subjective knowledge is inherently a person-by-person determination, the court cannot adopt Plaintiffs' en masse approach.  Although the court considers the evidence presented concerning each Defendant individually, the court has no duty "to scour the record in search of a genuine issue of triable fact," and may "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted).

harm Wereb faced.  Unlike the other Defendants, Mawae, Burgess, and Gomes observed specific indications that Wereb faced a substantial risk of serious harm.  From these indications, a reasonable factfinder could conclude based on inference and circumstantial evidence that Mawae, Burgess, and Gomes had the requisite subjective knowledge of the risk Wereb faced.  Further, a reasonable factfinder could also find based on Mawae, Burgess, and Gomes' individual observations that the substantial risk to Wereb was obvious to these Defendants "in light of reason and [] basic general knowledge."  *Thomas*, 2010 WL 2794394, at * 6.  Accordingly, as explained in detail below, the court finds that genuine issues of material fact remain as to Mawae, Burgess, and Gomes' subjective knowledge, but not as to Kia, Amano, Alvarez, Hankins, or Lee's subjective knowledge.

i.     No evidence of subjective knowledge -- Kia, Amano, Alvarez, Hankins, and Lee

Plaintiffs have presented no evidence that Kia, Amano, Alvarez, Hankins, or Lee subjectively knew that Wereb faced a substantial risk of serious harm.  In the deposition transcripts provided to the court, these Defendants did not make any statements that would suggest to a reasonable factfinder that they subjectively knew of Wereb's medical needs.  Other evidence presented to the court as to Kia, Amano, Alvarez, Hankins, or Lee's subjective knowledge is similarly unrevealing.  Further, Plaintiffs admitted at the July 12, 2010 hearing that

there was no evidence that Amano, Alvarez, Hankins, or Lee observed or knew of the contents of Wereb's intake form.

As for Kia, Plaintiffs have presented no evidence, circumstantial or otherwise, to counter Kia's assertion that she believed Wereb did not require medical attention. Kia interacted closely with Wereb during the intake process. She learned that Wereb was diabetic, but observed that Wereb understood her instructions and responded appropriately. Defs.' Ex. A at 2; Defs.' Ex. J, Kia Decl. ¶ 5. Kia did not perceive that Wereb was intoxicated. Defs.' Ex. A at 1; Defs.' Ex. J, Kia Decl. ¶¶ 4, 6, 7. Following intake, Kia monitored Wereb on Friday evening via video until her shift ended at 10:30 p.m. Defs.' Ex. J, Kia Decl. ¶ 7; Defs.' Ex. C at 1-2. Although Kia worked again on Saturday, there is no evidence to suggest that she was responsible for monitoring Wereb during this time. Joint Ex. 1; Defs.' Ex. C at 4-5. Kia stated that throughout the weekend, she saw no indication that Wereb was in medical distress or required medical attention and there is no evidence in the record that contradicts her statement. Defs.' Ex. J, Kia Decl. ¶¶ 7, 8. In sum, there is no evidence from which a factfinder could conclude that Kia was subjectively aware of Wereb's serious medical need.

Likewise, Plaintiffs have presented no evidence that contradicts either Amano or Alvarez' statements that they believed Wereb did not require medical

31

attention.  *See* Defs.' Ex. H, Amano Decl. ¶4; Defs.' Ex. K, Alvarez Decl. ¶5.

Unlike Kia, Amano and Alvarez never interacted with Wereb personally -- instead,

both observed Wereb exclusively through video.  Pls.' Ex. D, Amano Dep. at 61:2-

21; Pls.' Ex. C, Alvarez Dep. at 17:9-20:5, 22:6-12.  As a result, neither Amano

nor Alvarez had an opportunity to closely observe Wereb's condition or demeanor.

There is no evidence that either Amano or Alvarez knew that Wereb was homeless,

alcoholic, diabetic, or suffering from any other medical conditions.  Further,

Plaintiffs have not shown how Wereb's failure to eat, or any of his other behavior

that was apparent to Amano or Alvarez, might be an obvious sign that Wereb faced

a substantial risk of serious harm.  Accordingly, as with Kia, there is no evidence

from which a factfinder could find that either Amano or Alvarez had the requisite

subjective knowledge.

        Finally, Plaintiffs present no evidence tending to suggest that Hankins

or Lee subjectively knew that Wereb faced a substantial risk of harm.  Neither

Hankins nor Lee ever saw Wereb in person and there is no evidence either sergeant

participated in monitoring Wereb.  Pls.' Ex. H, Hankins Dep. at 32:17-18; Pls.' Ex.

B, Lee Dep. at 44:14-17; Defs.' Ex. C.  There is no evidence that either Hankins or

Lee knew that Wereb was homeless, alcoholic, diabetic, or suffering from any

medical conditions.  Indeed, Hankins' ability to learn about Wereb was especially

limited because Hankins worked exclusively during hours when Wereb had likely already died.  Joint Ex. 1.  Because Plaintiffs have submitted no evidence from which a reasonable finder of fact could find that Hankins or Lee had subjective knowledge, Plaintiffs cannot establish that these officers were deliberately indifferent.

In sum, Plaintiffs have adduced no evidence that Kia, Amano, Alvarez, Hankins, or Lee subjectively knew that Wereb was at risk.  Accordingly, no reasonable factfinder could conclude that these Defendants were deliberately indifferent and the court therefore GRANTS summary judgment to Kia, Amano, Alvarez, Hankins, and Lee on Plaintiffs' § 1983 claims.

       ii.     Evidence of subjective knowledge -- Mawae, Burgess, and Gomes

Plaintiffs present additional evidence, however, concerning Mawae, Burgess, and Gomes that does create a fact question concerning subjective knowledge.  The court examines this evidence as it relates to Mawae, Burgess, and Gomes in turn.

       A.    Mawae

Although Mawae asserts that he saw no indication that Wereb was in medical distress, there is nevertheless sufficient circumstantial evidence to create a genuine issue of fact regarding Mawae's subjective awareness of Wereb's serious

medical need.  Mawae knew that Wereb was untidy, disheveled, carrying a bottle of vodka, and intoxicated.  Defs.' Ex. A at 1; Defs.' Suppl. Ex. GG, Mawae Dep. at 8:9-23, 18:21-22.  Mawae also knew that Wereb had a slow and choppy gait, infected and swollen feet, difficulty standing unassisted, and small abrasions on his head.  Defs.' Ex. M, Mawae Decl. ¶¶ 6, 7; Defs.' Suppl. Ex. GG, Mawae Dep. at 37:9-21; Defs.' Ex. B at 2.  Further, Mawae observed Wereb behaving in a bizarre and incoherent manner when Wereb filled out the Miranda waiver form.  On that form, Wereb incorrectly wrote the date as August 29, 2008 (instead of September 26, 2008), marked the time as "60:0F pm," and wrote "THEARTS FOAM PUNKKS" on the line intended for his signature.  Defs.' Ex. N.

Cumulatively, these facts would allow a reasonable factfinder to conclude that Wereb's medical need was so obvious that Mawae must have been subjectively aware of it, despite Mawae's assertion to the contrary.  Specifically, when the evidence is viewed in the light most favorable to Plaintiffs, Mawae knew that Wereb was a homeless person -- likely without consistent prior medical care -- currently experiencing significant physical and cognitive difficulties.  Based on Mawae's knowledge of Wereb's background and physical state combined, and Mawae's observations of Wereb's bizarre entries on the Miranda waiver form, a reasonable jury could therefore conclude that Mawae was subjectively aware that

Wereb faced a serious risk of harm.

In opposition, Mawae emphasizes that he did not consider Wereb to require medical attention.  Given the evidence of obviousness, Mawae cannot succeed on summary judgment based simply on his own assertions of his mental state.  *Conn*, 591 F.3d at 1097 ("Proof of 'subjective awareness' is not limited to the purported recollections of the individuals involved.").  Mawae also states that the smell of liquor on Wereb's breath was only "faint" and that Wereb was comprehending and coherent.  Defs.' Ex. M, Mawae Decl. ¶¶ 4, 15.  These opposition arguments are unpersuasive, however, because Mawae fails to view the evidence in the light most favorable to Plaintiffs, as the court must on summary judgment.  As explained above, a reasonable factfinder could find that Wereb's intoxication, ambulatory difficulties, and incoherent responses, taken together, were obvious signs that Wereb had a serious medical need.  Given that Mawae failed to respond to this need in any way, a reasonable factfinder could find that Mawae was deliberately indifferent to Wereb's medical needs.

## B.    Burgess

Although Burgess also stated that medics would have been called if Wereb appeared to need medical attention, Defs.' Ex. G, Burgess Decl. ¶ 4, a reasonable factfinder could find that Burgess subjectively knew that Wereb could

be unconscious or in a coma and failed to act on that knowledge.  Burgess was

present during portions of Wereb's intake proceeding, Defs.' Ex. G, Burgess Decl.

¶¶ 3, 4, and he worked day shifts at the Lahaina Police Station on Friday, Saturday,

and Sunday during Wereb's confinement.  Joint Ex. 1.  During Wereb's

confinement, Burgess realized that Wereb may have been unconscious or in a

coma.  Pls.' Ex. E, Burgess Dep. at 93:12-20.[11]  Upon reaching this realization,

Burgess did not, however, observe Wereb in person, check to see if he was

breathing, or take any other actions to follow up on Wereb's condition.  *Id*. at

88:20-22, 93:21-94:15.

Based on this evidence, a reasonable factfinder could find that

Burgess "consciously disregarded a serious risk to [Wereb's] heath."  *Lolli*, 351

F.3d at 421.  A material question of fact thus exists as to whether Burgess was

deliberately indifferent to Wereb's medical needs.

---

[11]  In deposition, Burgess testified:

> Q.    [Plaintiff's counsel questioning].  Sure.  Do you realize that
>       Mr. Wereb may not have been dead during some of those
>       hours, but he could have been unconscious or in a coma?
> A.    [Burgess].  If you ask me if, if that's possible?
> Q.    Yeah.
> A.    It's possible.
> Q.    Did you realize that then in September 2008 on this shift?
> A.    Yes.

Pls.' Ex. E, Burgess Dep. at 93:12-20.

C.     Gomes

Gomes had no direct contact with Wereb and monitored him exclusively over video from 10:30 p.m. on Friday until 6:30 a.m. on Saturday, from 6:30 a.m. on Sunday until 2:30 p.m. on Sunday, and from 6:30 a.m. on Monday until 10:30 a.m on Monday.  Pls.' Ex. F, Gomes Dep. at 29:3-32:7, 36:12-16; Defs.' Ex. C at 2-3, 6-7, 10-11; Joint Ex. 1.

Gomes explained that she determined whether detainees were in distress in part by whether "[t]hey move around."  *Id*. at 50:22-51:2.  Gomes stated that if Wereb had exhibited signs of medical distress, she would have alerted her supervisors and medics would have been called.  Defs.' Ex. I, Gomes Decl. ¶ 5. Gomes also stated, however, that she did not see Wereb move around while she monitored him -- and despite movement being the focus of Gomes' monitoring, Gomes did not follow up on Wereb's condition when she saw that he was not moving.  *Id*. at 51:3-10, 57:4-7.  Gomes stated that she "d[i]dn't know" why she did not follow up on Wereb's failure to move.  *Id*. at 57:6-9.[12]

---

[12]  In deposition, Gomes testified:

> Q.     [Plaintiff's counsel questioning].  What about Dennis Wereb, what were you looking for for him when you looked at the monitor?
> A.     [Gomes].  That he was there.
> Q.     Was he there?

(continued...)

Based on Gomes' assertion that she considered movement a proxy for well-being and that she observed Wereb failing to move throughout her shift, a reasonable factfinder could infer that Gomes was subjectively aware that Wereb faced a substantial risk of serious harm.  Further, based on Gomes' failure to observe Wereb in person or otherwise follow up on her observation that he was not moving, a reasonable factfinder could find that Gomes failed to adequately respond to that risk.  A material question of fact therefore exists as to whether Gomes was deliberately indifferent to Wereb's medical needs.

### 4.     *Qualified Immunity*

Given the court's determination above that a material question of fact exists as to whether Mawae, Burgess, and Gomes were deliberately indifferent, the court must next determine whether these Defendants are nevertheless entitled to summary judgment on Plaintiffs' § 1983 claims on the grounds of qualified immunity.

---

[12](...continued)

| | |
|---|---|
| A. | Yes. |
| Q. | Is that all you were looking for? |
| A. | If he was moving. |
| Q. | And he wasn't moving, was he? |
| A. | No. |
| Q. | I'm wondering why you didn't follow up on that. |
| A. | I don't know. |

Pls.' Ex. F, Gomes Dep. at 56:24-57:11.

The defense of qualified immunity "shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The defense of qualified immunity requires a two-part analysis. First, the court must ask -- as it did above -- whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, given that a violation could be found on a favorable view of Plaintiffs' facts, the court must look to see whether the violated right was clearly established. *Id.*

The "general law regarding the medical treatment of prisoners was clearly established" well before Wereb's death in 2008. *See Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Hamilton v. Endell*, 981 F.3d 1062, 1066 (9th Cir. 1992)). Specifically, before 2008, it was "clearly established that officers could not intentionally deny or delay access to medical care." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)); *see also Lolli*, 351 F.3d at 421-22 (finding that officers accused of being deliberately indifferent to a diabetic detainee's medical needs were not entitled to summary judgment on the basis of qualified

immunity).  Accordingly, the court finds that Mawae, Burgess, and Gomes are not entitled to qualified immunity.

In opposition, Defendants contend that it was not clearly established in 2008 that monitoring a pretrial detainee via video was unconstitutional.  The court need not reach this issue; Defendants' monitoring of Wereb over video is immaterial here where the evidence, when viewed in the light most favorable to Plaintiffs, would allow a reasonable factfinder to conclude that Mawae, Burgess, and Gomes were subjectively aware of and disregarded a substantial risk to Wereb's health.

In sum, the court finds that a material question of fact exists concerning whether Mawae, Burgess, and Gomes were deliberately indifferent to Wereb's medical needs.  Because Mawae, Burgess, and Gomes are not entitled to qualified immunity, the court DENIES summary judgment to these Defendants on Plaintiffs' § 1983 claims.

## B.     Plaintiffs' Supervisory Liability Claims

Plaintiffs contend that MPD Sergeants Burgess, Hankins, and Lee are liable as supervisors under § 1983.

### 1.     *Supervisory Liability Framework*

Supervisory officials "may not be held liable for the unconstitutional

conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).  The term supervisory liability is therefore something of a "misnomer" because "[e]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 1949. Accordingly, supervisory officials "cannot be held liable unless they themselves" violated a constitutional right. *Id.* at 1952.  Thus, supervisors "can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Edgerly v. City & County of S.F.*, 599 F.3d 946, 961-62 (9th Cir. 2010) (citing *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)).

### 2.    *Failure to Train Application*

A supervisor is liable under § 1983 for failing to train subordinates when the failure to train amounts to deliberate indifference. *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Clement*, 298 F.3d at 905 (holding that a plaintiff must allege facts showing that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the [supervisor] . . . can reasonably

41

be said to have been deliberately indifferent to the need") (quoting *Canton*, 489

U.S. at 389).  A plaintiff must allege facts showing that the failure to train resulted

from a defendant's "deliberate" or "conscious" choice and that a sufficient causal

connection exists between the supervisor's wrongful conduct and the alleged

constitutional violation.  *Canell*, 143 F.3d at 1213 (citation omitted); *Redman v.*

*County of San Diego*, 942 F.2d 1435, 1446-47 (9th Cir. 1991).

       Burgess and Lee explained that MPD sergeants are not charged with

training the PSAs.  Pls.' Ex. E, Burgess Dep. at 54:4-7; Pls.' Ex. B, Lee Dep. at

29:15-23.  In turn, Plaintiffs present no evidence from which a reasonable

factfinder could conclude that Hankins, Burgess, and Lee were responsible for

training the PSAs.  Instead, Plaintiffs rely exclusively on the disciplinary actions

taken against Hankins, Burgess, and Lee -- which found that these officers violated

the requirement in General Order 103.1 § IV(B)(1) to "Command, Lead, Direct,

Train, Guide, & Supervise" -- in order to argue that Hankins, Burgess, and Lee had

a duty to train.  Budge Decl. Ex. A at 2-4; *see also* Defs.' Supp. Ex. HH

§ IV(B)(1).[13]  Although § IV(B)(1) in part concerns training, the provision only

---

[13]  Defendants contend that the disciplinary actions against Hankins, Burgess, and Lee are
inadmissible subsequent remedial measures under Federal Rule of Evidence 407.  Rule 407
provides that "evidence of subsequent remedial measures is not admissible to prove negligence,
culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or
instruction."  Rule 407 "does not require the exclusion of evidence of subsequent measures when
(continued...)

obligates supervisory officers to train sworn police officers -- and not civilian employees like the PSAs.  Defs.' Supp. Ex. HH §§ III, IV(B)(1).[14]  As a result, the record is devoid of evidence that Hankins, Burgess, and Lee had a duty or responsibility to train the PSAs.  *See Edgerly*, 599 F.3d at 961-62 (finding that supervisory liability cannot be established merely on the basis that a supervisor is responsible for day-to-day operations and provides informal training to his or her

---

[13](...continued)

offered for another purpose . . . ."  Although Rule 407 itself is silent on the admission of subsequent remedial measures to show existence of a duty, the Advisory Committee Note to Rule 407 lists "existence of a duty" as one of the allowable purposes for which evidence of a subsequent remedial measure may be admitted.  Fed. R. Evid. 407 (advisory committee note); *see also* Weinstein's Fed. Evid. § 407.06[3]; *Carstens Packing Co. v. Swinney*, 186 F. 50, 53 (9th Cir. 1911) (admitting evidence of subsequent safety measures taken by the defendant that "tended to point out the duty of the defendant").  Before admitting evidence of a subsequent remedial measure in order to show the existence of a duty, "the trial judge should be satisfied that the need for such evidence is substantial, that the issue is actually in dispute, and that the plaintiff's need outweighs the danger of its misuse by the jury."  Weinstein's Fed. Evid. § 407.06[3].

    Here, Plaintiffs submit evidence that Hankins, Burgess, and Lee were disciplined to show that the sergeants had a duty to train the PSAs.  Plaintiffs' need for such evidence is substantial because Plaintiffs must show that Hankins, Burgess, and Lee were responsible for training the PSAs in order to show that these officers' inaction was culpable.  Further, the issue of the sergeants' duty to train is actually in dispute because Hankins, Burgess, and Lee contest Plaintiffs' assertion that they had a duty to train.  Finally, there is little danger of misuse of the evidence here where (1) the issue is not yet before the jury and (2) liability will not automatically follow if the court concludes Hankins, Burgess, and Lee did, in fact, have a duty to train the PSAs.  Accordingly, the court DENIES without prejudice Defendants' evidentiary objection regarding the disciplinary records and, for the purposes of these motions, considers the disciplinary actions to the extent they show that Hankins, Burgess, and Lee had a duty to train the PSAs.

    [14]  Specifically, although the three supervisors were disciplined for failing to "lead, direct, train, guide, and supervise officers in their assigned duties," Defs.' Supp. Ex. HH § IV(B)(1), "officers" are defined to include only commissioned police officers, not PSAs.

subordinates).

### 3.    *Acquiescence and Reckless or Callous Indifference Application*

Plaintiffs next contend that supervisory liability is appropriate because Hankins, Burgess, and Lee acquiesced in a constitutional deprivation or their conduct showed a reckless or callous indifference to the rights of others.  Plaintiffs only show, however, that Hankins, Burgess, and Lee acquiesced in failing to enforce MPD's Monitoring Policy -- not that these officers personally countenanced deprivations of constitutional rights by their subordinates.  *See* Pls.' Ex. B, Lee Dep. at 58:10-13 (explaining that MPD employees at the Lahaina Police station did not follow MPD's Monitoring Policy).  Similarly, Plaintiffs have put forth no facts to show that in their roles as supervisors, Hankins, Burgess, and Lee acted unconstitutionally through any conduct that showed a reckless or callous indifference to the rights of others.[15]

Accordingly, the court GRANTS summary judgment to Hankins, Burgess, and ee on Plaintiffs' supervisory liability claims under § 1983.

### C.    **Plaintiffs' § 1983 Claims Against Maui County**

Plaintiffs allege that Maui County is liable pursuant to § 1983 based

---

[15]  As discussed above, however, Plaintiffs have raised a genuine question of material fact whether Burgess was deliberately indifferent to Wereb's serious medical needs when Burgess himself monitored Wereb.

on Maui County's failure to train Individual Defendants.  Maui County disagrees,

and seeks summary judgment.

### 1.    *Municipal Liability Framework*

Municipalities may be sued directly under § 1983 because they are

legal "persons" subject to § 1983 liability.  *Monell v. Dep't of Social Servs. of N.Y.*,

436 U.S. 658, 690-91 (1978).  Because a municipality may not be held liable under

a theory of respondeat superior, a municipality itself must inflict an injury to be

liable under § 1983.  *Id*. at 694.  Municipalities may be liable pursuant to

§ 1983 for omissions, including the failure to train, when those omissions inflict

constitutional injury and amount to the municipality's own official policy.

*Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (citing

*Canton*, 489 U.S. at 390 (1989)).[16]

Liability may only be imposed for failure to train when that failure

"reflects a 'deliberate' or 'conscious' choice by a municipality."  *Canton*, 489 U.S.

at 389.  Further, failure to train claims "can only yield liability against a

municipality where that city's failure to train reflects deliberate indifference to the

_____

[16]  Additionally, municipalities may be liable pursuant to § 1983 for either
(1) implementation of official policies or established customs that inflict constitutional injury; or
(2) when "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it."  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010).  These bases for municipal liability are not at issue here.

constitutional rights of its inhabitants." *Id*. at 392.  Given these restrictions on

municipal liability, a plaintiff seeking to impose liability against a county for

failure to train must show: "(1) [A]n inadequate training program, (2) deliberate

indifference on the part of the County in adequately training its law enforcement

officers, and (3) [that] the inadequate training 'actually caused' a deprivation of [a

plaintiff's] constitutional rights." *Merritt v. County of L.A.*, 875 F.2d 765, 770 (9th

Cir. 1989); *see also Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir.

2002) (setting forth a similar three-prong test) (citation omitted).[17]  Notably, the

county policy amounting to deliberate indifference "can be one of action or

inaction." *Long v. County of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing

*Canton*, 489 U.S. at 388).

"Deliberate indifference" in *Canton*'s municipal liability context has a

distinct meaning from the subjective deliberate indifference standard set forth for

individual liability in *Farmer*.  *Canton*, 489 U.S. at 390; *see also Gibson*, 290 F.3d

---

[17]  Additionally, *Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002) (citing *Amos v. City of Page*, 257 F.3d 1086, 1094 (9th Cir. 2001)), states that a plaintiff seeking to impose liability against a county for deliberate indifference must show that "a County employee violated [the plaintiff's] rights."  Plaintiffs contend that such a showing of individual liability is not a prerequisite to a finding of liability by Maui County.  Pls.' Opp'n to Maui County's Mot. for Summ. J. at 27; *see also Gibson*, 290 F.3d at 1186 n.7 (noting that the requirement that individual defendants have violated a plaintiff's constitutional rights in order to find municipal liability "has been rejected as [] inflexible").  Because a genuine issue of material fact remains as to whether Mawae, Burgess, and Gomes acted with deliberate indifference to Wereb's serious medical needs in violation of the Fourteenth Amendment, the court need not reach the issue of whether Maui County could remain liable without a finding of individual liability.

at 1187 n.8 (noting that deliberate indifference standards "somewhat confusingly"

differ).  In the municipal context, deliberate indifference is an *objective* standard,

not a *subjective* one.  *Canton*, 489 U.S. at 390; *see also Farmer*, 511 U.S. at 840-

41 (finding that *Canton*'s objective deliberate indifference test applies to

municipal, but not individual, defendants); *Gibson*, 290 F.3d at 1187 n.8

(explaining that "[a]s opposed to the *Farmer* standard, . . . the *Canton* standard

assigns liability even when a municipality has constructive notice that it needs to

remedy its omissions in order to avoid violations of constitutional rights")

(citations omitted).

Given that an objective deliberate indifference standard applies in the

municipal liability context, municipal liability may be imposed when "the need for

more or different training is so obvious, and the inadequacy so likely to result in

the violation of constitutional rights, that the policymakers of the city can

reasonably be said to have been deliberately indifferent to the need."  *Canton*, 489

U.S. at 390; *see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407-09

(1997) (explaining that deliberate indifference may be shown through a "pattern of

tortious conduct by inadequately trained employees" or where "a violation of

federal rights may be a highly predictable consequence of a failure to equip law

enforcement officers with specific tools to handle recurring situations").  "Whether

a local government has displayed a policy of deliberate indifference to the

constitutional rights of its citizens is generally a jury question." *Gibson*, 290 F.3d

at 1194-95 (citation omitted).

### 2.   *Municipal Liability Application*

The court examines in turn the three elements of municipal liability

for failure to train.  *See Merritt*, 875 F.2d at 770.

### a.   *Inadequate training program*

Drawing all inferences in favor of Plaintiffs, a reasonable factfinder

could conclude that Maui County inadequately trained its employees to monitor the

medical needs of detainees.  Six MPD PSAs and sergeants stated that they were not

trained on MPD's Monitoring Policy.  Pls.' Ex. F, Gomes Dep. at 23:17-20; Pls.'

Ex. D, Amano Dep. at 37:2-8; Pls.' Ex. G, Tabios Dep. at 42:6-11; Pls.' Ex. E,

Burgess Dep. at 61:19-22, 108:13-16; Pls.' Ex. B, Lee Dep. at 65:17-24; Pls.' Ex.

H, Hankins Dep. at 58:7-10.  Maui County's employees did not receive training on

what to look for when monitoring detainees via video, Pls.' Ex. B, Lee Dep. at

29:4-7; Pls.' Ex. E, Burgess Dep. at 29:13-15; Pls.' Ex. D, Amano Dep. at 14:12-

14, and did not receive training on how to determine if detainees were at risk for

alcohol withdrawal or experiencing symptoms of alcohol withdrawal.  Pls.' Ex. F,

Gomes Dep. at 18:19-19:22; Pls.' Ex. D, Amano Dep. at 24:18-21; Pls.' Ex. B, Lee

48

Dep. at 31:17-20; Pls.' Ex. E, Burgess Dep. at 47:10-21, 45:5-21.

Maui County's employees' lack of training is apparent in their confusion about MPD's Monitoring Policy and their widely divergent views about what MPD's Monitoring Policy required.  Pls.' Ex. D, Amano Dep. at 36:2-9; Pls.' Ex. E, Burgess Dep. at 61:11-15; Pls.' Ex. A, Phillips Dep. at 74:12-76:4 (stating that employees had to monitor the detainees with in-person visual checks every fifteen minutes); Pls.' Ex. E, Burgess Dep. at 60:3-12 (stating that in-person visual checks are required every eight hours); Pls.' Ex. D, Amano Dep. at 33:4-25 (stating that in-person visual checks are required every eight hours); Pls.' Ex. B, Lee Dep. at 44:18-46:21 (stating that he understood MPD's Monitoring Policy never to require in-person visual checks).

Moreover, also when viewing the evidence in the light most favorable to Plaintiffs, Maui County's failure to adequately train is evident by the fact that as a matter of practice, Maui County employees did not follow MPD's Monitoring Policy and instead monitored all detainees exclusively through video monitoring without conducting in-person visual checks.  Pls.' Ex. B, Lee Dep. at 58:10-13; Pls.' Ex. F, Gomes Dep. at 28:15-20, 36:17-20.  Individual Defendants' failure to conduct any in-person checks on Wereb supports the conclusion that Maui County employees had a practice of not following MPD's Monitoring Policy.  *See* Pls.' Ex.

F, Gomes Dep. at 29:3-32:7, 36:12-16; Pls.' Ex. C, Alvarez Dep. at 17:9-20:5, 22:6-12; Pls.' Ex. D, Amano Dep. at 61:2-21; Pls.' Ex. H, Hankins Dep. at 32:17-18; Pls.' Ex. E, Burgess Dep. at 88:20-22; Pls.' Ex. B, Lee Dep. at 44:14-17.  The evidence suggests that employees would have conducted in-person visual checks on detainees had they been trained to do so.  Pls.' Ex. F, Gomes Dep. at 37:2-14; Pls.' Ex. B, Lee Dep. at 65:22-66:5.

Based on this evidence, a reasonable factfinder could conclude that Maui County inadequately trained its employees to monitor detainees to determine if they needed medical care.

b.    *Deliberate indifference by Maui County*

Again drawing all inferences in favor of Plaintiffs, a reasonable factfinder could find that Maui County's inadequate training of its employees was deliberately indifferent.

A reasonable factfinder could find that the failure to provide detainees with the right to medical care was an obvious consequence of Maui County's employees' failure to closely monitor detainees or view them in person.  The fact that Wereb lay motionless for approximately twenty-seven hours before he was found dead supports the conclusion that detainees were not monitored with a level of care required to notice even the most basic of medical needs.  Further, given the

50

known drawbacks of monitoring by video -- including the inability to spot signs of medical distress like sweating, shaking, or changes in skin color -- it should have been obvious to Maui County that monitoring detainees exclusively by video would deprive county employees of an accurate understanding of detainees' medical needs.

The danger of Maui County's failure to train its employees in monitoring was further exacerbated by the fact the detainees in Maui are particularly likely to require medical care.  MPD's Chief of Police, as well as many MPD employees, are aware that a large population of homeless alcoholics live in Maui and frequent the Lahaina Police Station.  Pls.' Ex A, Phillips Dep. at 18:12-25; Pls.' Ex. B, Lee Dep. at 30:23-31:9; Pls.' Ex. D, Amano Dep. at 27:14-19; Pls.' Ex. E, Burgess Dep. at 51:21-24, 52:11-15; Pls.' Ex. F., Gomes Dep. at 13:3-9, Pls.' Ex. C, Alvarez Dep. at 63:20-22.  As a result, it should have been obvious to Maui County that its employees would likely encounter detainees experiencing alcohol withdrawal, which can be accompanied by serious and life-threatening side effects.  Jarris Decl., Ex. 1 ¶¶ 4, 5; Rosazza Decl. ¶ 2 ("The risks associated with alcohol withdrawal have long been known to the law enforcement and correctional community.").

Given these facts, and the fact that the question of a municipality's

deliberate indifference is generally a jury question, *Gibson*, 290 F.3d at 1194-95, the court finds that a question of fact remains on the issue of Maui County's deliberate indifference.

       *c.    Causation*

       Finally, a question of fact exists concerning whether Maui County's inadequate training "actually caused" Wereb's death.  Plaintiffs' experts assert that Wereb's death would have been avoided by more vigilant monitoring.  Jarris Decl. Ex. 1 at 6; Spritz Decl. Ex. 1 at 5-6; Rosazza Decl. Ex. 1 at 6.  Maui County disagrees.  Accordingly, a question of fact remains on whether Maui County's failure to train was the moving force behind the violation of Wereb's rights.

       In sum, the court finds that a reasonable jury could find that Maui County had an inadequate training program, was deliberately indifferent in training its employees, and that that deliberate indifference "actually caused" Wereb's death.  *See Merritt*, 875 F.2d at 770 (setting forth the municipal liability standard for failure to train).  Questions of fact therefore remain and the court DENIES summary judgment to Maui County on Plaintiffs' § 1983 claims.

**D.    Plaintiffs' State Law Wrongful Death Claim**

       Plaintiffs allege that Individual Defendants and Maui County are liable for wrongful death pursuant to Hawaii Revised Statute ("HRS") § 663-3.

Individual Defendants contend that they are entitled to summary judgment on the wrongful death claim because they are entitled to state law immunity.

"Hawaii law provides that a nonjudicial government official has a qualified or conditional privilege with respect to his or her tortious actions taken in the performance of his or her public duty." *Edenfield v. Estate of Willets*, 2006 WL 1041724, at *11 (D. Haw. Apr. 14, 2006) (citing *Towse v. State of Hawaii*, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982)); *see also Medeiros v. Kondo*, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974). Government officials are not entitled to immunity, however, when a plaintiff "demonstrate[s] by clear and convincing proof that those officials were stirred by malice and not by an otherwise proper purpose." *Towse*, 64 Haw. at 631, 647 P.2d at 702.

The Hawaii Supreme Court has "realize[d] that the word malice has acquired a plethora of definitions," *id.*, and has defined malice differently in different contexts. For defamation claims, Hawaii uses a "reasonable man" test to determine malice. *Id*. For other tort law claims, however, Hawaii courts apply an "actual malice" test. *Awakuni v. Awana*, 115 Haw. 126, 140-41, 165 P.3d 1027, 1041-42 (2007) (considering "actual malice" to determine immunity in the context of an alleged breach of fiduciary duty); *Edenfield*, 2006 WL 1041724, at *12 (considering "actual malice" to determine immunity for claims of assault, battery,

53

intentional infliction of emotional distress and negligent infliction of emotional distress); *Ogden v. County of Maui*, 554 F. Supp. 2d 1141, 1153 (D. Haw. 2008) (considering "actual malice" to determine immunity for a negligence claim).

To determine whether a defendant acted with actual malice, "the phrase 'malicious or improper purpose' should be defined in its ordinary and usual sense." *Awakuni*, 115 Haw. at 141, 165 P.3d at 1042. Malice is therefore defined as "the intent, without justification or excuse, to commit a wrongful act, reckless disregard of the law or of a person's legal rights, and ill will; wickedness of heart." *Id*. (quoting Black's Law Dictionary 976 (8th ed. 2004)) (internal quotation marks omitted). The existence or absence of malice is generally a question for the jury. *Runnels v. Okamoto*, 56 Haw. 1, 5, 525 P.2d 1125, 1129 (1974). The court may rule on the issue of malice as a matter of law, however, when the presence or absence of malice is demonstrated via uncontroverted affidavits or depositions. *Id*.

Based on the previous discussion about Individual Defendants' potential liability for constitutional violations, a reasonable jury could find that Mawae, Burgess, and Gomes acted with an improper purpose or in reckless disregard of the law when they subjectively realized that Wereb faced a substantial risk of harm but failed to check on Wereb or summon help. The court concludes that there is a genuine issue of fact as to whether Mawae, Burgess, and Gomes

were motivated by malice or an improper purpose.  Accordingly, the court finds that Mawae, Burgess, and Gomes are not entitled to summary judgment on the basis of immunity.  As for Hankins, Lee, Amano, Alvarez, and Kia, the affidavits and depositions demonstrate that these Defendants did not act with malice. Because this evidence is uncontroverted, these Defendants are entitled to state law immunity.

In opposition, Plaintiffs contend that Amano, Alvarez, and Kia are not entitled to state law immunity because they are not "government officials" and lack "police powers."  Plaintiffs present no support for their contention that PSAs are not government officials shielded by immunity.  Amano, Alvarez, and Kia were sued based on their performance of their duties as employees of Maui County.  As a result, Amano, Alvarez, and Kia are "government officials" within the meaning of *Towse*.  *See Pahk v. Hawaii*, 109 F. Supp. 2d 1262, 1269 (D. Haw. 2000) (holding that "[u]nder Hawaii law, a nonjudicial government official performing a public duty enjoys the protection of what has been termed a qualified or conditional privilege") (citing *Towse*, 64 Haw. at 631, 647 P.2d at 702).

///

///

///

Accordingly, the court DENIES summary judgment to Mawae,

Burgess, and Gomes on Plaintiffs' wrongful death claims and GRANTS summary

judgment to Hankins, Lee, Amano, Alvarez, and Kia on Plaintiffs' wrongful death

claims.[18]

## V.  CONCLUSION

Based on the above, the court GRANTS in part and DENIES in part

Individual Defendants' Motion for Summary Judgment and DENIES Defendant

Maui County's Motion for Summary Judgment.  Specifically, the court GRANTS

summary judgment on all counts to Kia, Amano, Alvarez, Hankins, and Lee.

Plaintiffs' § 1983 claims remain against Mawae, Burgess, and Gomes in their

individual capacities, and against Maui County based on a failure to train.

///

///

///

---

[18]  Further, because a question of material fact remains as to whether Mawae, Burgess, and Gomes were motivated by malice or an improper purpose, a material question of fact likewise remains concerning whether Maui County is entitled to immunity.  *See Kahale v. City & County of Honolulu*, 104 Haw. 341, 349, 90 P.3d 233, 241 (2004) (holding that a municipality is "subject to the state's tort laws in the same manner as any other private tortfeasor"); *Lane v. Yamamoto*, 628 P.2d 634, 636 (Haw. Ct. App. 1981) (holding that under Hawaii law, a municipality may be held liable under a theory of respondeat superior for an employee's tortious act that is committed with malice and within the scope of an employee's employment).  The court therefore DENIES summary judgment to Maui County on Plaintiffs' wrongful death claims.

Plaintiffs' state law wrongful death claims also remain against Mawae, Burgess, Gomes, and Maui County.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 28, 2010.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Wereb v. Maui County*, *et al.*, Civ. No. 09-00198 JMS/LEK, Order (1) Granting in Part and Denying in Part Defendants Hankins, Burgess, Lee, Gomes, Amano, Alvarez, Mawae, and Kia's Motion for Summary Judgment and (2) Denying Defendant Maui County's Motion for Summary Judgment